UNITED STATES BANKRUPTCY COURT          **FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:                                       Chapter 11

DELTA AIR LINES, INC., *et al.*,             05 B17923 (ASH)
                                           (Jointly Administered)
                     Reorganized Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

VARDE INVESTMENT PARTNERS, L.P., BEAR
STEARNS INVESTMENT PRODUCTS INC., PAR-
FOUR MASTER FUND, LTD., SUNRISE PARTNERS
LIMITED PARTNERSHIP, and CYPRESS
MANAGEMENT MASTER LP,

                     Plaintiffs,             Adv. Proc No. 07-3065A

       -against-

COMAIR, INC., COMAIR HOLDINGS, LLC,
COMAIR SERVICES, INC., DELTA AIRELITE
BUSINESS JETS, INC. and DELTA CONNECTION
ACADEMY, INC.,

                     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**A P P E A R A N C E S :**

**WHITE & CASE LLP**
**Attorneys for Plaintiffs**
**By: Evan C. Hollander**
     **Andrew W. Hammond**
     **Scott Greissman**
     **Douglas P. Baumstein**
     **Stefan Ebaugh**
     **Lydia E. Lin (on the brief)**
**1155 Avenue of the Americas**
**New York, NY 10036**

**DEBEVOISE & PLIMPTION LLP**
**Attorneys for Defendants**
**By: Michael E. Wiles**
     **Karen Y. Paik**
     **Jessica R. Simonoff**
     **Lauren E. Sypek**
     **Richard F. Hahn (on the brief)**
**919 Third Avenue**
**New York, NY 10022**

**AKIN, GUMP, STRAUSS, HAUER & FELD, LLP**
**Attorneys for the Post-Effective Date Committee**
**By:  David H. Botter, Esq.**
**590 Madison Avenue**
**New York, NY 10022**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

## DECISION GRANTING MOTION TO DISMISS

   Before the Court is the reorganized debtors/defendants' motion under Federal Rule of Bankruptcy Procedure 7012 and Federal Rule of Civil Procedure 12(b) to dismiss the Amended Complaint in this adversary proceeding.   Plaintiffs allege they hold $125,000,000 in claims against one or more of the Comair debtors.[1]  The Amended Complaint asserts a single claim under 11 U.S.C. § 1144 to revoke the debtors' Joint Plan of Reorganization (the "Plan") that was confirmed on April 25, 2007 "based upon the Comair Debtors' fraud in the procurement of the confirmation order".  Amended Complaint ¶ 1.  The gravamen of the Amended Complaint is that the debtors' Disclosure Statement dated February 2, 2007 was false and fraudulent because the debtors failed to update an estimate of total creditor claims against the Comair debtors as events occurring after February 2 rendered the estimate materially understated, resulting in an overestimate of the likely percentage of recovery for Comair creditors under the Plan.

### Jurisdiction

   The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(b) and 157(a) and the standing order of referral to bankruptcy judges signed by Acting Chief Judge Robert J. Ward on July 10, 1984.  The adversary proceeding now before the Court is a core proceeding under 28 U.S.C. § 157(b)(2).

---

[1]  The Comair debtors are the following entities: Comair, Inc.; Comair Holdings, LLC; Comair Services, Inc.; Delta Airelite Business Jets, Inc.; and Delta Connection Academy, Inc.

### Background[2]

Reorganized debtor Delta Air Lines, Inc. ("Delta") is a legacy mainline airline carrier operating a hub and spoke network of airline connections. Delta contracts with seven competitive regional airlines that provide "regional lift" for Delta — supplying service to smaller markets by connecting them with larger cities, using relatively smaller aircraft.

Reorganized debtor Comair, Inc. is one such regional airline and is wholly-owned by Delta. Delta is Comair's only customer. Delta controls the scheduling, pricing and marketing of Comair's flights and is responsible for the financing of the Comair fleet of aircraft and, by virtue of a call option or otherwise, has the power to withdraw aircraft from Comair operation and place the aircraft with other regional airlines.

On September 14, 2005 Delta, thirteen other Delta affiliates (together, the "Delta debtors")[3] and the Comair debtors each filed separate chapter 11 bankruptcy petitions (collectively, the "debtors"). The cases have been jointly administered but were never substantively consolidated. There was only one Official Committee of Unsecured Creditors, though several members of the Committee held claims against both the Delta debtors and the Comair debtors.

The debtors filed an initial proposed Disclosure Statement for Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code on December 19, 2006 and filed amendments to the proposed disclosure statement on January 19, 2007 and February 2, 2007. The February 2 Disclosure Statement (the "Disclosure Statement") was approved by this Court without unresolved objection on February 7, 2007.

---

[2]   In this Background section the Court takes judicial notice of certain undisputed facts established in these bankruptcy proceedings.

[3]   The Delta debtors are the following entities: ASA Holdings, Inc.; Crown Rooms, Inc.; DAL Aircraft Trading, Inc.; DAL Global Services, LLC; DAL Moscow, Inc.; Delta Air Lines, Inc.; Delta Benefits Management, Inc.; Delta Corporate Identity, Inc.; Delta Loyalty Management Services, LLC; Delta Technology, LLC; Delta Ventures III, LLC; Epsilon Trading, Inc.; Kappa Capital Management, Inc.; and Song, LLC.

The debtors' proposed Joint Plan of Reorganization was attached as an exhibit to the December 19, 2006 disclosure statement and amended versions were attached to the January 19, 2007 and February 2, 2007 disclosure statements. The final amended Plan was submitted to the Court on April 23, 2007.

The basic structure of the Plan, insofar as it is relevant here, was premised on limited separate consolidations of the Comair debtors' estates with one another and the Delta debtors' estates with one another, though the Comair debtors' estates remained separate from the Delta debtors' estates.[4] The Plan provided that the general unsecured Comair creditors would receive a fixed percentage of the stock of reorganized Delta ("New Delta Common Stock" or "Stock") based on the relative equity valuation of the Comair debtors' assets vis-à-vis the Delta debtors' assets. In this regard, the Delta debtors' and the Comair debtors' estates were in effect substantively consolidated in that creditors of both the Delta debtors' estates and the Comair debtors' estates received New Delta Common Stock in satisfaction of their claims. It was determined that the mid-point of the "pro forma consolidated equity value" range (a range of $610 million to $840 million) for the Comair debtors was $730 million and that the mid-point of the pro forma equity valuation range for the Delta debtors was $10 billion. Accordingly, it was determined that the Comair creditor body would receive approximately 6.8% of the shares of New Delta Common Stock and the Delta creditor body would receive the remaining 93.2% of shares.[5] The Comair allocation was to be distributed pro rata amongst the general unsecured Comair creditors.

Because the total number of shares of New Delta Common Stock available to Comair creditors was a fixed number, any increase in the total amount of claims against Comair would result in a concomitant decrease in the number of shares available for pro rata distribution to each claimant, thereby decreasing the expected recovery of each creditor. In the Disclosure Statement the debtors estimated that

---

[4]     The estates of the Comair debtors and the Delta debtors, respectively, were consolidated "solely for purposes of actions associated with Confirmation of the Plan and the occurrence of the Effective Date, including voting, Confirmation and distribution." Disclosure Statement at 73.

[5]     The allocation of fixed percentages of New Delta Common Stock based on equity valuations of Delta asset value and Comair asset value is not challenged in this adversary proceeding.

the total unsecured claims that would eventually be allowed against the Comair debtors after litigated claims objections and negotiated settlements (a process that could take many months if not years after confirmation) would be $800 million. Disclosure Statement at 65. By comparing the estimated claims amount of $800 million with the "pro forma consolidated equity value" of the Comair assets (a range from $610 million to $840 million), the debtors estimated that the total "recovery" for unsecured Comair creditors would be in the range of 76% to 100% of the face value of their claims, with 91% being the mid-point.[6] *Id.* at 141. The estimated "recovery" range did not account for the effect of any potential variance from the $800 million claims estimate, though this fact was fully disclosed. *See id.* at 142.

Notably, this estimated "recovery" was a purely hypothetical number produced by the debtors to, *inter alia*, satisfy the requirements of 11 U.S.C. § 1129(a)(7) and was not intended in any way to reflect the actual recovery that the unsecured Comair creditors would obtain by way of selling their New Delta Common Stock. It is evident that the only real measure of the "recovery" under the Plan by Comair and Delta creditors is the ever-changing market value of New Delta Common Stock. As stated in the Disclosure Statement:

> The Valuation Analyses represent hypothetical values that reflect the estimated intrinsic value of the Reorganized Debtors, the Delta Debtors and the Comair Debtors derived through the application of various valuation techniques. Such analyses do not purport to represent valuation levels which would be achieved in, or assigned by, the public or private markets for debt and equity securities. Estimates of value do not purport to be appraisals or necessarily reflect the values which may be realized if assets are sold as a going concern, in liquidation, or otherwise.

> The Valuation Analyses were developed solely for purposes of the formulation and negotiation of the Plan and to enable the holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their Affiliates.

> * * *

> The Debtors and Reorganized Debtors do not intend and do not undertake any obligation to update or otherwise revise the Valuation Analyses to reflect events or circumstances

---

[6]    The 91% figure obviously is not the mid-point between 76% and 100%. It is the mid-point between 76% (*i.e.* $610 million ÷ $800 million) and 105% (*i.e.* $840 million ÷ $800 million).

existing or arising after the date the Valuation Analyses are initially filed or to reflect the occurrence of unanticipated events. Therefore, the Valuation Analyses may not be relied upon as a guarantee or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, holders of Claims or Interests must make their own determinations as to the reasonableness of any assumptions underlying the Valuation Analyses and the reliability of the Valuation Analyses.

*Id.* at 143-44.

The deadline to vote and to file objections to the Plan was April 9, 2007.

The Comair creditors voted overwhelmingly to approve the Plan. Holders of 543 claims (totaling $2,645,495,426.33) cast votes and 530 of the claims (totaling $2,645,037,712.70) were voted to approve the Plan — thus 97.61% of voting claims in number and 99.98% of voting claims in amount voted to "accept" the Plan. The Delta creditors also voted overwhelmingly to approve the Plan. Holders of 27,564 claims (totaling $11,299,701,597.91) cast votes and 26,797 of the claims (totaling $10,998,494,408.91) were voted to approve the Plan — thus 97.22% of voting claims in number, and 97.33% of voting claims in amount voted to "accept" the Plan. The Plan was confirmed by this Court on April 25, 2007 over a mere four unresolved objections, three of which were brought by *pro se* litigants.

### The Amended Complaint

The gravamen of the Amended Complaint is that the defendants fraudulently procured Comair creditor approval of the Plan by failing to update the estimate of claims against the Comair debtors that was contained in the Disclosure Statement, despite knowing that it was understated before the date of the confirmation hearing. The plaintiffs allege that "[b]y March 27, 2007 the Comair Defendants knew that their estimate of the claims pools was materially understated" (Amended Complaint ¶ 1), yet the defendants repeated that estimate in an SEC filing on that date. The plaintiffs further note that the defendants made no public statements that would indicate that the $800 million claims estimate was understated prior to the April 9, 2007 voting deadline or the April 25, 2007 confirmation hearing. However, on June 13, 2007 it was revealed that the estimate of claims against the Comair debtors had been revised upward to $1.05 billion. The effect of the June 13 estimate of Comair claims was a reduction in the number of shares to be received by the holder of each unsecured claim against the Comair debtors and

consequent reduction in the hypothetical projected mid-point "recovery" for unsecured Comair creditors from 91% to approximately 69%.

The plaintiffs allege two circumstances that were the "primary drivers for the change to expected recoveries," namely, (1) a settlement with the Air Line Pilots Association ("ALPA") that was preliminarily reached on February 13, 2007 and resulted in damages claims exceeding the amount estimated for those claims in the February 2, 2007 Disclosure Statement by about $82.5 million[7] and (2) a settlement with Merrill Lynch dated April 23, 2007 that "created a damages claim that exceeded the Debtors' 'best estimates' contained in the Disclosure Statement by more than $100 million." *Id.* at ¶ 2. It is alleged that the Merrill Lynch settlement "was achieved by employing a methodology for negotiating the restructuring of aircraft leases that was materially different from the methodology underlying the assumptions in the Disclosure Statement." *Id.* at ¶ 3. The plaintiffs allege that the defendants had actual knowledge of these circumstances prior to the confirmation hearing yet did not publicly update their claims estimates in violation of an alleged duty to do so, and that "[h]ad there been disclosure reflecting the Comair Debtors' actual 'best estimates', the Comair Creditors may not have voted in favor of the Comair Plan." *Id.* Although the ALPA and Merrill Lynch settlements did not occur until February 13 and April 23, respectively, if the Amended Complaint were to be read in its broadest sense one might infer an allegation that the defendants somehow knew or should have known that the claims estimates were false *at the time they were made*, *i.e.*, on February 2, 2007. But the thrust of the amended complaint as written clearly is that the defendants breached a *duty to update* the $800 million Comair claims estimate.

In summary, the amended complaint alleges that by (i) making an estimate of the amount of the Comair claims pool in the Disclosure Statement which subsequent events suggest will prove to be substantially less than total Comair claims, (ii) failing to update the Disclosure Statement before the confirmation hearing and (iii) using a different methodology for negotiating the restructuring of aircraft

---

[7]    The Amended Complaint alleges that "all or a substantial portion of the $82.5 million [ALPA] claim against Comair was not included in the original $800 million claim pool estimate for the Comair Debtors." ¶ 29.

leases than the one underlying the assumptions in the Disclosure Statement, the defendants fraudulently procured votes in favor of the Plan and fraudulently procured the April 25, 2007 order confirming the Plan.

### The Motion to Dismiss

The defendants have responded to the Amended Complaint by filing the instant motion to dismiss. They argue that the Amended Complaint should be dismissed for failure to state a claim for fraud. The principal theory underlying the Amended Complaint is that the Plan was fraudulently procured because the debtors violated an alleged duty to update the claims estimates contained in the Disclosure Statement. In response defendants point out that the Disclosure Statement made it quite clear that it *would not* be updated. The first two pages of the Disclosure Statement contained the following language in capitalized letters:

> THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF.
>
> * * *
>
> THE DEBTORS AND REORGANIZED DEBTORS DO NOT INTEND TO AND DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR OTHERWISE REVISE THE FINANCIAL PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THESE FINANCIAL PROJECTIONS ARE INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

Again, on page 169 of the Disclosure Statement, the debtors made it overwhelmingly clear that the Disclosure Statement would not be updated:

> HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. THE DEBTORS UNDERTAKE NO OBLIGATION TO PUBLICLY UPDATE OR REVISE ANY FORWARD-LOOKING STATEMENTS TO REFLECT EVENTS OR CIRCUMSTANCES THAT MAY ARISE AFTER THE DATE OF THIS DISCLOSURE STATEMENT.

Speaking specifically to the estimate of claims against the Comair debtors that is alleged to have been understated, the Disclosure Statement noted as follows:

> *Claims Estimates.*  The projected recoveries set forth in the Plan and this Disclosure
> Statement are based on certain assumptions, including the Debtors estimates of the
> Claims that will eventually be Allowed in various classes. The following table sets forth
> information on Claims filed in the Debtors cases, Claims Disallowed to date and Claims
> that the Debtors estimate will eventually be Allowed. There is no guarantee that the
> ultimate amount of each of such categories of Claims will conform to the estimates set
> forth below.

Disclosure Statement at 63.  Indeed, in the column with the heading "Total Allowed Claims (estimate),"

the debtors noted with a footnote that they could only "currently estimate that at the conclusion of the

Claims objection, reconciliation and resolution process, the aggregate amount of Allowed Claims in each

class will be approximately as indicated in this column."  *Id.*  Defendants also argue that the Disclosure

Statement made it quite clear that change from the February 2, 2007 estimate of claims to the amount of

claims ultimately allowed many months if not years later could be a reduction in the projected recovery of

unsecured claimants.  Section 8.2 of the Disclosure Statement, denominated "Factors Affecting the Value

of Securities to be Issued Under the Plan," includes as one of its "factors" subsection (g) headed

"Allowance of Claims May Substantially Dilute the Recovery to Holders of Claims Under the Plan."

Subsection (g) states as follows:

> There can be no assurance that the estimated Claim amounts set forth in this Disclosure
> Statement are correct, and the actual allowed amounts of Claims may differ from the
> estimates.  The estimated amounts are based on certain assumptions with respect to a
> variety of factors, including, but not limited to, assumptions with respect to the final
> amount of Allowed Claims relating to Aircraft Equipment and Post-Petition Aircraft
> Agreements. Should these underlying assumptions prove incorrect, the actual allowed
> amounts of Claims may vary from those estimated herein.  Because distributions to
> holders of Unsecured Claims under the Plan are linked to the amount and value of
> Allowed Unsecured Claims, any material increase in the amount of Allowed Unsecured
> Claims over the amounts estimated by the Debtors would materially reduce the recovery
> to holders of Unsecured Claims under the Plan.

*Id.* at 159.  In the section of the Disclosure Statement that estimated the unsecured creditors' recovery for

the purposes of satisfying the so-called 'best interests of the creditors test' under Section 1129(a)(7), it

was plainly stated that the projected recoveries were based on various assumptions and subject to change:

> The projected recovery ranges listed . . . are estimates that are derived from the Financial
> Projections and other assumptions. . . .   Actual recoveries may be different than pro-
> jected recoveries based upon, among other things: (x) the market price of the shares of
> New Delta Common Stock; (y) the dilutive or accretive effects of the issuance of shares
> of New Delta Common Stock by Reorganized Delta from time to time (including the

dilutive effects of future issuances under the Compensation Programs) and (z) the actual amount of Allowed Claims against each of the Delta Debtors and the Comair Debtors as the Debtors Claims objection and reconciliation process continues.

*Id.* at 142.

Defendants point out that the Disclosure Statement specifically addressed each of the two events that have been cited by the plaintiffs as the "primary drivers for the change to expected recoveries." Amended Complaint ¶ 2. With regard to the ALPA claim, the Disclosure Statement described the ongoing situation with ALPA in two separate sections, including a notation that the two sides were "with the assistance of a mediator, continuing negotiations toward an agreement to reduce Comair's pilot labor costs." Disclosure Statement at 38 and 164. However, the Disclosure Statement was careful to note that "[t]he outcome of all of these matters cannot be predicted." *Id.* With regard to the renegotiation of aircraft leases, the Disclosure Statement listed these pending renegotiations as one of the "factors" in the Section 8.2 "Factors Affecting the Value of the Securities to be Issued Under the Plan." Specifically, subsection (c) stated as follows:

> The Debtors are engaged in a comprehensive effort to reduce their aircraft costs. The Debtors business plan is based on certain assumptions concerning the results of this effort, including assumptions with respect to the number and types of aircraft remaining in the Debtors fleet at its conclusion and the timing and amount of the cost savings achieved. While the Debtors have negotiated significant reductions in financing costs with respect to many aircraft, in most cases these agreements are subject to the negotiation of additional terms and conditions and the preparation of definitive documentation. In certain cases, the Debtors have only entered into written agreements with aircraft financing parties concerning the continuing use of the aircraft during the bankruptcy proceeding and the terms of a new lease remain to be negotiated and definitive documentation to be prepared. There can be no assurance that these negotiations and the preparation of definitive documentation will in all cases be concluded by consummation of the Plan. The Debtors could be adversely affected to the extent they are unable to reach agreements covering any aircraft and to the extent they are unable in agreements they do reach to achieve the savings reflected in the Financial Projections.

*Id.* at 158.

Defendants argue that any rational person reading the Disclosure Statement could not help but reach the conclusion that the projections contained therein would not be updated and were very likely to change due to the occurrence of events after February 2, 2007, that all creditors were aware of this fact prior to the February 7, 2007 hearing where the Disclosure Statement was approved by this Court

without unresolved objection, and that if any creditor disagreed with the Disclosure Statement's point-in-time approach, the time to raise those concerns was prior to the February 7, 2007 hearing, not months later.

Defendants refute any alleged duty to update, noting that the point-in-time financial projection approach is the *only* way for a complex Chapter 11 bankruptcy such as this one to result in a successful reorganization. Claims estimates are inherently moving targets as the negotiation and litigated objection process and appeals unfold. If the Court were to impose upon the debtors a duty to update their disclosure statement every time an event occurred that was at variance with the debtors' estimates and projections, a plan might never be confirmed. This result is dictated by the Federal Rules of Bankruptcy Procedure, which require creditors to receive a minimum of twenty-five days' advance notice of a hearing to consider any updated disclosure statement, followed by an additional minimum of twenty-five days to object to or vote on confirmation based on the information contained in the updated disclosure statement. *See* Fed. R. Bankr. P. 2002(b). After this passage of at least fifty days, it is likely if not certain that projections contained in the now "updated" disclosure statement will have become stale, requiring the debtors to update the disclosure statement yet again. The only way to allow the debtors to break free from an endless loop of disclosure requirements and proceed to a successful reorganization, debtors argue, is for the Court to approve a disclosure statement with point-in-time financial projections and no duty to update.

Defendants also argue that the Amended Complaint does not allege facts sufficient to demonstrate that plaintiffs have standing to demand the drastic remedy of Plan revocation under Section 1144, and that in fact plaintiffs do not have such standing. The burden is on a plaintiff to plead sufficient facts for the Court to find that she has standing. *See Warth v. Seldin*, 422 U.S. 490, 518 (U.S. 1975) ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."). Where standing is at issue, this burden is greater. The first circuit has articulated the standard as follows:

> [W]here standing is at issue, heightened specificity is obligatory at the pleading stage.
> The resultant burden cannot be satisfied by purely conclusory allegations or by a
> Micawberish reading of a party's generalized averments.  To the contrary, the propo-
> nent's pleadings 'must be something more than an ingenious academic exercise in the
> conceivable.'  The complainant must set forth reasonably definite factual allegations,
> either direct or inferential, regarding each material element needed to sustain standing.

*United States v. AVX Corp.*, 962 F.2d 108, 115 (1st Cir. 1992) (quoting *United States v. Students*

*Challenging Regulatory Agency Procedures*, 412 U.S. 669, 687 (U.S. 1973)).  Where standing is not

apparent from the complaint, "it is within the trial court's power to allow or to require the plaintiff to

supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed

supportive of plaintiff's standing.  If, after this opportunity, the plaintiff's standing does not adequately

appear from all materials of record, the complaint must be dismissed."  *Warth v. Seldin*, 422 U.S. 490,

501-502 (1975).

   In the context of Section 1144, the only parties with standing to bring suit are "part[ies]

in interest" to the bankruptcy proceeding.  It appears that plaintiffs are five entities that engage, in part, in

the business of trading in distressed claims.   Plaintiffs' only averment on standing is found in paragraph 9

of the Amended Complaint, which says: "Each of the above Plaintiffs is a party in interest, and collec-

tively, the Plaintiffs hold aggregate claims against the Comair Debtors in excess of $125,000,000."  Be-

cause the Court should not accept bare legal conclusions, *see, e.g.*, *Bell Atl. Corp. v. Twombly*, 127 S. Ct.

1955, 1964-65 (2007), defendants assert that the Court cannot give weight to the conclusory assertion that

"[e]ach of the . . . Plaintiffs is a party in interest."  This leaves the plaintiffs' standing claim precariously

teetering on the assertion that "the Plaintiffs hold aggregate claims against the Comair Debtors in excess

of $125,000,000."  The trouble with this assertion, defendants argue, is that it is not supported by the

official records of this Court.  None of the plaintiffs was listed on the official claims register at any time

prior to the April 25, 2007 date of confirmation.  Only plaintiff Bear Stearns Investment Products Inc. is

shown on the claims register as having filed a claim against Comair in the amount of $2,128,370, less

than 1.7% of the amount the plaintiffs claim to hold.   The burden is not great — plaintiffs need only state

the facts as to their alleged claims purchases.  Given that the official claims register of the Court appears

to rebut their pleaded conclusory allegations, defendants argue that it was incumbent on the plaintiffs to

provide further facts in the Amended Complaint, or by affidavit in response to the motion to dismiss for

lack of standing, explaining the nature, dates of purchase and other relevant information as to the claims

they hold.  This they did not do.  The plaintiffs' conclusory assertion of standing is "[e]mpirically

unverifiable," not "supported . . . by the stated facts" and "deserve[s] no deference."  *United States v. AVX

Corp.*, 962 F.2d 108, 115 (1st Cir. 1992) (quotation marks and citations omitted).

Defendants point out that none of the plaintiffs appears to have held claims that would

have entitled it to vote on the Plan.   This may be an additional ground for finding that the plaintiffs do

not have "party in interest" standing.   Generally speaking, the "parties in interest" with standing to assert

a fraud claim, such as a claim under Section 1144, are the parties that were themselves defrauded.  In the

context of Section 1144, those parties are the holders of claims that were allegedly defrauded into voting

in favor of the Plan.  The plaintiffs here apparently are speculative investors who purchased claims

against Comair after the voting deadline.  Their motives in purchasing and now seeking revocation of the

Plan are not the same as the interests of the 97.61% in number and 99.98% in amount of Comair creditors

who actually voted on the Plan and who have acted in reliance on its continued implementation.  None of

those creditors has seen fit to join the present suit.  In this context, it may be argued that the plaintiffs'

interests are not sufficiently aligned with the allegedly defrauded parties to confer "party in interest"

standing under Section 1144.  Indeed, the interests of these five plaintiffs claiming to hold $125 million in

claims and seeking revocation of the Plan are in patent conflict with the tens of thousands of Delta and

Comair creditors holding $13.9 billion of claims who voted for the Plan, not to mention the parties to

countless post-confirmation transactions valued in the billions of dollars in reliance on the Plan.

Defendants correctly point out that this is not a securities fraud claim where plaintiffs

could allege that *they* were defrauded, *i.e.*, that they purchased their claims in reliance on false and mis-

leading statements by the debtors.  Section 1144 provides the radical remedy of revocation of an order

confirming a plan "if and only if such order was procured by fraud."  The fraud referred to here was a

fraud that "procured" a vote to confirm the plan, *i.e.*, a fraud on *creditors entitled to vote on confirmation*,

since they are the only creditors from whom confirmation could have been procured by fraud. To have

standing to assert a Section 1144 claim, defendants argue, plaintiffs must allege facts showing that they

were within the class of creditors upon whom the fraud was practiced in procuring confirmation.[8]

Defendants also note, from vague statements the plaintiffs have made outside the

Amended Complaint, that with the exception of the direct claims held by Bear Stearns, it appears that all

of the plaintiffs' claims are based on leveraged lease debt.[9] The actual claims against the Comair debtors

appear to be held by owner trustees, who in turn have pledged those claims to indenture trustees, who

possess voting rights on behalf of debt-holders (plaintiffs here) pursuant to a trust indenture. Some or all

of the creditor claims now held by plaintiffs may have been voted by indenture trustees in favor of the

Plan. It is far from clear that the plaintiffs have standing to assert the indenture trustees' rights. In some

cases, debt-holders may have standing to assert the rights belonging to an indenture trustee, but in many

cases they will not. *Compare, In re Bd. of Dirs. of Multicanal S.A.*, 307 B.R. 384, 387 n.2 (Bankr.

S.D.N.Y. 2004) with *In re Delta Air Lines, Inc.*, 370 B.R. 537 (Bankr. S.D.N.Y. 2007). The relative

rights of the debt-holders and the indenture trustees (including any rights that may give rise to the plain-

tiffs' standing) are set forth in great detail in the trust indentures. The plaintiffs have not provided, sum-

marized or even referred to these pivotal controlling documents. The Amended Complaint and plaintiffs'

responses to the motion simply do not give sufficient facts to allow the Court to assess the relationship

---

[8]    Plaintiffs argued that they need not allege and prove reliance on their part because a false or misleading (or un-updated) disclosure statement can be deemed a "fraud on the court." The argument is inapposite for two reasons. First, reliance in the securities fraud sense is not the issue raised by defendants' motion to dismiss — the issue is standing. Second, "fraud on the court" does not apply in the context of decisions made by creditors and not by the court. The concept of fraud on the court is relevant only to issues of fact or law which are to be decided by the court. A creditor vote on confirmation is not such an issue. Only creditors have the right to vote on confirmation, and when creditors vote for or against in the number and amount set by Congress in the statute, that vote is binding on the court regardless of a judge's view to the contrary. The concept of fraud "on the court" is meaningless in the context of a Section 1144 revocation such as this based on a creditor vote because the court's confirmation order was dictated not by any determination of the court as to the adequacy of the recovery provided to unsecured creditors, but by the vote of the creditors. It is only a fraud on the creditors entitled to vote that can be said to have "procured" the order confirming the Plan.

[9]    For background information on aircraft leveraged lease financing, see this Court's decision in *In re Delta Air Lines, Inc.*, 370 B.R. 552 (Bankr. S.D.N.Y. 2007).

between these plaintiffs and the various indenture trustees to discern whether they may properly assert those indenture trustees' rights in this bankruptcy proceeding.[10]

The defendants also assert that because the plaintiffs (or their predecessors in interest) accepted benefits under the Plan, they are precluded from asserting that it was fraudulently procured. This assertion is grounded in the legal principle that a party who knowingly accepts the benefits of an allegedly fraudulent transaction affirms the transaction and therefore may not seek to rescind it on the grounds that it was fraudulently procured. *See, e.g.*, *Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc.*, 543 N.Y.S.2d 750, 754 (N.Y. App. Div. 1982).

Persuasive as they may be, it is unnecessary to address any of these grounds for dismissal urged by defendants, because as shown in point III, below, revocation is barred by the express terms of Section 1144(1), and by the doctrine of equitable mootness.

### Discussion

## I.    Standards governing a motion to dismiss

The motion to dismiss is based on Federal Rules of Civil Procedure 9(b) and 12(b), made applicable in bankruptcy proceedings under Bankruptcy Rules 7009 and 7012. Rule 12(b)(6) allows a motion to dismiss for "failure to state a claim upon which relief can be granted." Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

In reviewing a motion to dismiss under Rule 12(b)(6), "a court merely assesses the legal feasibility of the complaint, and does not weigh the evidence that may be offered at trial." *Global Entm't, Inc. v. N.Y. Tel. Co.*, No. 00 Civ. 2959, 2000 U.S. Dist. LEXIS 16038, at *2 (S.D.N.Y. Nov. 6, 2000) (citing *Festa v. Local 3 Int'l Brotherhood of Elec. Workers*, 905 F.2d 35, 37 (2d Cir. 1990); *Geisler v.*

---

[10]    In addition to the standing barriers raised by the documents themselves, there are Constitutional barriers that may prevent the plaintiffs from asserting the rights of the indenture trustees. Under the Supreme Court's "prudential" limitations on standing, a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*, 422 U.S. at 499. The Court can only assess the application of this doctrine to the facts of this case after the plaintiffs have met their pleading burdens.

*Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).  The court "must construe any well-pleaded factual alle-

gations in the complaint in favor of the plaintiff. . . ."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993);

*see also*, *Cohen v. Koenig*, 25 F.3d 1168, 1171-72 (2d Cir. 1994) ("When ruling on a motion pursuant to

Rule 12(b)(6) to dismiss for failure to state a claim upon which relief may be granted, the court must

accept the material facts alleged in the complaint as true."); *Zdenek Marek v. Old Navy (Apparel) Inc.*,

348 F. Supp. 2d 275, 279 (S.D.N.Y. 2004).  Accordingly, a court may not "'dismiss a complaint for

failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support

of his claim which would entitle him to relief.'"  *Cruz v. Beto*, 405 U.S. 319, 322 (U.S. 1972) (quoting

*Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  This is not to say, however, that every statement in a

complaint must be accepted as true.  "The allegations of a complaint must be 'well pleaded' and thus the

court need not accept 'sweeping and unwarranted averments of fact.'"  *Perniciaro v. Natale (In re

Natale)*, 136 B.R. 344, 348 (Bankr. E.D.N.Y. 1992) (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1254

(D.C. Cir. 1987)); *see also Correa-Martinez v. Arrillaga-Belendez*, 903 F.2d 49, 52 (1st Cir. 1990) ("[The

court] need not credit bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or

outright vituperation.").  "Empirically unverifiable conclusions, not logically compelled, or at least

supported, by the stated facts, deserve no deference."  *United States v. AVX Corp.*, 962 F.2d 108, 115 (1st

Cir. 1992) (quotation marks and citations omitted).

       In resolving a Rule 12(b)(6) motion the Court may consider "the factual allegations in the

complaint, . . . documents attached to the complaint as exhibits, or incorporated in it by reference,  . . .

matters of which judicial notice may be taken [and] documents on which the plaintiff relied in bringing

suit." *Mosello v. ALI, Inc. (In re Mosello)*, 190 B.R. 165, 168 (Bankr. S.D.N.Y. 1995), *aff'd,* 193 B.R.

147 (1996), *aff'd,* 104 F.3d 352 (2d Cir. 1996); *see also*, *Leslie Fay Cos., Inc. v. Corporate Prop. Assocs.

3 (In re Leslie Fay Cos., Inc.)*, 166 B.R. 802, 807-08 (Bankr. S.D.N.Y. 1994) (citing *Brass v. Am. Film

Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

**II.    The governing statute – 11 U.S.C. § 1144**

Section 1144 of the Bankruptcy Code, 11 U.S.C. § 1144,  provides the only means by

which a court can revoke an order confirming a Chapter 11 plan.  It states:

**11 U.S.C. § 1144.  Revocation of an order of confirmation**

On request of a party in interest at any time before 180 days after the date of the entry of
the order of confirmation, and after notice and a hearing, the court may revoke such order
if and only if such order was procured by fraud. An order under this section revoking an
order of confirmation shall—

(1) contain such provisions as are necessary to protect any entity acquiring rights
in good faith reliance on the order of confirmation; and

(2) revoke the discharge of the debtor.

In the Amended Complaint the plaintiffs rely solely on Section 1144, as of course they

must.  *See, e.g.*, *In re Longardner & Assocs., Inc.*, 855 F.2d 455, 460 (7th Cir. 1988) ("[S]ection 1144 is

the only avenue for revoking confirmation of a plan of reorganization.").  Given its central importance to

the present suit, it is worth highlighting a few significant features of this statute.

First, the statute says "the court *may* revoke such order. . . ."   The importance of the

auxiliary verb "may" is that the decision of whether to revoke a confirmation order rests in the sound

discretion of the court.  Significantly, the court may decline to revoke the order of confirmation *even if* it

finds that the order *was* procured by fraud.  *See Salsberg v. Trico Marine Servs. (In re Trico Marine

Servs.)*, 343 B.R. 68, 74 (Bankr. S.D.N.Y. 2006) (dismissing an action brought under Section 1144

because even if the plaintiff could prove fraud, the court could not fashion a remedy that met the require-

ments of Section 1144); *Ogden v. Ogden Modulars (In re Ogden Modulars)*, 180 B.R. 544, 547 (Bankr.

D. Mo. 1995) ("Section 1144 does not mandate revocation of the order of confirmation after a finding of

fraud in the procurement."); 8 Collier on Bankruptcy ¶ 1144.03[4] at 1144-5 (15th ed. rev. 2006) ("[T]he

court may decline to revoke the order even after finding that fraud has occurred.").  In exercising its dis-

cretion, the court may consider "whether revocation of the order of confirmation can or would lead to an

outcome that is more equitable than leaving the order intact."  8 Collier on Bankruptcy ¶ 1144.03[4] at

1144-5 (15th ed. rev. 2006).

In contrast with this discretionary language stands the statutory command that any order revoking a confirmation order "*shall* — (1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation. . . ."  The use of the imperative "shall" leaves no room for discretion.  All orders revoking orders of confirmation *must* protect innocent parties.  Under this statutory scheme, if a court cannot fashion a revocation order that protects innocent parties who acquired rights in reliance on the confirmation order, the court is *barred* from revoking the confirmation order — even if the order was procured by fraud.  For reasons that are amplified in point III, below, the statute bars revocation of the confirmation order in this case because an order satisfying the mandatory statutory predicate cannot be drafted.

Another noteworthy feature of this statute is the relatively short time frame in which a cause of action may be filed.  The request to revoke the confirmation order must come "before 180 days after the date of the entry of the order of confirmation."  Courts have been very strict in their adherence to this 180-day rule.  *See, e.g.*, *BFP Invs., Inc. v. BFP Invs., Ltd.*, 150 Fed. Appx. 978, 979 (11th Cir. 2005); *In re Orange Tree Assocs.*, 961 F.2d 1445, 1447 (9th Cir. 1992) (holding that a request made within 180 days of a modified confirmation order — entered three months after the original confirmation order — but more than 180 days after the original confirmation order was time-barred); *In re Medical Analytics, Inc.*, 410 F. Supp. 922, 923 (S.D.N.Y. 1975) (holding — under Section 1144's predecessor statute — that the 180-day period runs from the date of the confirmation order, even if the fraud is not discovered in the 180-day period).  The policy consideration of finality for a plan of reorganization — which benefits all parties who have dealings with the debtor — compels this rule.  While 180 days is the outside window within which a request must be made to revoke a confirmation order in the simplest Chapter 11 cases, it should go without saying that in cases with more complicated plans of reorganization that impact greater numbers of interested parties, the time frame within which a request for revocation should be made necessarily shortens because the level of difficulty required to comply with the statute and protect innocent third parties in a revocation order increases exponentially.

Against this backdrop, it should be noted that the plaintiffs here filed suit on the 180th day following the entry of the confirmation order.  While the plaintiffs may have technically complied with

the letter of the law,[11] they have certainly failed to comply with its spirit.  According to the plaintiffs' own account, the alleged fraud was made public on June 13, 2007 — a mere forty-nine days following the entry of the confirmation order.  Nonetheless, the plaintiffs waited an additional 131 days to file their suit on October 22, 2007.  In the meantime, the cases of four of the five defendants herein were fully administered and their cases were closed on September 28, 2007.  In those intervening 131 days and in the time since then, the plaintiffs have been content to sit back and allow the implementation of the Plan to proceed.  As noted previously, the 180-day window provided by the statute applies in the simplest Chapter 11 cases.  This case, in contrast, was one of the more complex Chapter 11 cases — at the time of filing, the case was the tenth largest bankruptcy ever filed in the United States.  Given the complexity of the Plan and the fact that numerous parties acted in reliance on it daily following the effective date, it behooved the plaintiffs to move forward with a great sense of urgency.  The plaintiffs' delay in bringing this suit and their failure to seek a stay of the Plan's implementation pending the outcome of this suit both cut against the Court's exercise of its discretion to revoke the Plan.  As amplified below, these considerations also compel the conclusion that the plaintiffs' cause of action is equitably moot.

Finally, the statute allows the court to revoke a confirmation order "[o]n request of a party in interest . . . *if and only if* such order was *procured* by fraud."  Because the court is bound by the votes of creditors when issuing its confirmation order, in order to demonstrate that the confirmation order was procured by fraud it should be shown that at least some of the creditors would have voted differently absent the alleged fraud.  While there is no way to know for certain whether the required majority of creditors would have voted in favor of the plan absent the fraud, it is instructive to consider which parties

---

[11]    It is not at all clear that the plaintiffs have complied with the letter of the law.  The plaintiffs filed their original complaint on the 180th day following the entry of the confirmation order.  However, the statute requires the action to be brought "*before* 180 days after the date of the entry of the order of confirmation." 11 U.S.C. § 1144 (emphasis added).  Hence, it appears that the suit must be filed by the 179th day following the entry of the order of confirmation — a deadline the plaintiffs here did not meet.  The plaintiffs may be saved by Federal Rule of Bankruptcy Procedure 9006, which extends certain time periods where the last day of the period falls on a weekend or holiday.  The parties have not briefed the point, so I express no judgment on this issue.  Clearly, however, the claims of plaintiff Sunrise Partners Limited Partnership are barred by the 180-day rule because its claims were not asserted until 205 days after the date of entry of the order of confirmation.

have seen fit to join the suit for plan revocation.  If a substantial number of the creditors who voted in

favor of a plan bring suit to revoke the plan on the grounds that they were defrauded into voting for it,

this should influence a court to exercise its discretion to revoke the plan if it finds that the plan was fraud-

ulently procured.  Conversely, in cases like this one, where none of the plaintiffs seeking to revoke the

plan appear to have had the right to vote on confirmation, and none of the voting creditors who were al-

legedly defrauded into voting for confirmation have joined in or supported the suit to revoke the plan, the

court should be cautious in exercising its discretion to revoke the confirmation order.

**III.    The impossibility of complying with
        Section 1144(1); equitable mootness**

        A revocation order pursuant to Section 1144 cannot be issued in this case for two

separate and independent (although obviously related) reasons.  First, under the facts here no revocation

order could possibly comply with the statutory requirements of Section 1144(1).  Second, the doctrine of

equitable mootness precludes this Court from revoking the order of confirmation.

        **A.    Section 1144(1)**

        Section 1144(1) expressly requires, through the use of the imperative "shall," that any

order revoking an order of confirmation must: "(1) contain such provisions as are necessary to protect any

entity acquiring rights in good faith reliance on the order of confirmation."  If the court cannot comply

with this statutory mandate, the court has no discretion to revoke the confirmation order and cannot do so.

 *See Salsberg v. Trico Marine Servs. (In re Trico Marine Servs.)*, 343 B.R. 68, 71 (Bankr. S.D.N.Y. 2006)

(explaining that "the Court cannot revoke the plan unless 'it can fashion an order that would revoke the

debtor's discharge, restore the status quo existing before confirmation and protect those who relied in

good faith on confirmation'") (quoting *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.)*, 171

B.R. 666, 669 (Bankr. D. Ariz. 1994)).  The same holds true regardless of any other findings that the

court may make, including the presence of fraud.

The many complex transactions that have occurred since the Plan's April 30, 2007 Effective Date have made it impossible for the Court to comply with the requirement of Section 1144(1).[12] New Delta Common Stock ("Stock") was listed on the New York Stock Exchange and began trading under the symbol "DAL" on May 3, 2007.   Since then, approximately 290 million shares of Stock and 3 million Stock purchase options have been distributed to both Delta and Comair creditors and to eligible employees.   Seven million shares of Restricted Stock have been issued.   As of April 29, 2008, more than 820 million trades had taken place involving these shares.[13]   On the Effective Date, the reorganized debtors entered into a senior secured exit financing facility to borrow up to $2.5 billion from a syndicate of lenders.   Some of these proceeds were used to repay debtor-in-possession financing facilities under which the Comair debtors were obligors.   The reorganized Comair debtors have guaranteed all obligations under the exit financing facilities and have pledged substantially all of their assets as security for the secured portions of the exit financing facilities.   The reorganized debtors have assumed management of Comair's properties.   Under the Plan, various executory contracts and unexpired leases were deemed rejected as of the Effective Date and, pursuant to authority granted in the Plan, the Comair debtors have negotiated various new leases and other contracts (including the restructuring of all of Comair, Inc.'s aircraft leases and financings) and have effectuated numerous claims settlements. Administrative, tax and other priority claims have been paid.   The cases of four of the five Comair debtors have been fully administered and closed.   On April 14, 2008 Delta announced a merger agreement with Northwest Airlines, apparently resulting in an increase in the volume of Stock trading.

*All* of the thousands of transactions involving billions of dollars referred to in the preceding paragraph have been negotiated and executed based upon the debtors' joint Plan.   There is no separate Comair plan that could be revoked, as suggested by plaintiffs.   There is but one joint Plan which

---

[12]    The facts recited in this paragraph are not disputed and are either reflected in official Court records or are otherwise sufficiently established by reliable, publicly-available sources as to be beyond dispute.   The Court takes judicial notice of these facts.

[13]    New Delta Common Stock has been volatile over this period.  DAL has traded as low as $6.50 and as high as $21.95 between May  3, 2007 and April 29, 2008.

inextricably links all the debtors, all their pre-petition creditors who are now or will eventually be the holders of reorganized Delta Stock, and all present and past contract counterparties whose rights were affected or effected by the Plan.  The panoply of these transactions constitutes a vast omelette which cannot be unscrambled.

Revocation of the confirmation order is barred because the Court cannot possibly protect the countless numbers of parties who have "acquir[ed] rights in good faith reliance on the order of con-firmation."  Trading in the Stock alone precludes a protective order.   Both Delta and Comair creditors have already received Stock, hundreds of millions of shares of which have changed hands and are cur-rently in the possession of parties who received Stock under the Plan and others who received Stock in the open market.  These trades were necessarily in reliance on the Plan and based on information subse-quent to the Plan such as consolidated financial statements.  No one could possibly trace and cancel all of the trades that have taken place since the issuance of the Stock.  Countless innocent parties who relied on the confirmation order would undoubtedly be harmed by any attempt of this Court to revoke the order. *See Trico Marine Servs.*, 343 B.R. at 72 (dismissing a Section 1144 claim where new common stock would have to be canceled because doing so would be "difficult and time-consuming, and might not be sufficient to 'protect' the current shareholder as required by § 1144").

Further, any effort to revoke or modify the debtors' senior secured exit financing facili-ties would be highly prejudicial to the innocent parties who relied on the order of confirmation when they extended financing.[14]  The Court cannot restore the prior debtor-in-possession financing obligations and force prior debtor-in-possession lenders to step back into their prior roles.  Since confirmation of the Plan, cross-securitization of Comair and Delta assets has occurred.  With confirmation of the Plan came Delta's

---

[14]    Plaintiffs incorrectly assert that "[t]he commitments of the exit lenders were not conditioned on the Comair Debtors' emergence from Chapter 11 along with the Delta Debtors, or the Delta Debtors' retention of their equity in the Comair Debtors."  Plaintiffs' Memorandum at 45-46.   The exit financing term sheet that was attached to the Disclosure Statement specified that one of the "Conditions to Closing" was that the Plan be approved without a materially adverse amendment — such as the severance of the Comair plan and the concomitant inability of Delta to pledge Comair's assets as security.

continued ownership of Comair.  Severance with respect to only Comair would undercut the reliance of lenders on the Plan and fail to satisfy the requirement of Section 1144.

The plaintiffs make several implausible suggestions to support the contention that harm to innocent parties can be mitigated.  They argue that "the existence of obligations incurred by the reorganized debtor is not a bar to plan revocation — such obligations can be made administrative obligations of the Comair Debtors, thereby adequately protecting such counterparts as required under section 1144(1)."  Plaintiffs' Memorandum at 45.  Not only is this proposition wrong, but also the plaintiffs incorrectly rely on *Trico Marine*.  The Bankruptcy Code does not give courts the power to transform complex transactions negotiated by reorganized debtors without judicial supervision into administrative priority expenses payable under Section 503(b).  Even if this Court had the power to do so, such an approach would protect the parties who deal with the reorganized debtors at the expense of the creditors who acquired rights in good faith reliance on the confirmation order.  In *dicta*, the court in *Trico Marine* stated that in the hypothetical situation where a plan simply distributed money to creditors, granting unpaid vendors, who dealt with the reorganized debtors, an administrative priority in the reinstated proceedings could protect the unpaid vendors.  *Trico Marine Servs.*, 343 B.R. at 71.  The court, which dismissed the complaint seeking revocation, was careful to note that "[m]ore complex plans involving transactions among the debtor, its creditor, and third parties obviously present greater problems."  *Id.*  The transactions involved here, as described above, extend far beyond simple vendor/vendee dealings that the court referred to in *Trico Marine*.   Moreover, the remedial scenario posited by plaintiffs would constitute modification of the Plan, for which there is no statutory or other authority.

Plaintiffs further assert that revocation would not require rescission of the Stock.  It is hard to see how this assertion could possibly be true.  A fundamental premise of the Plan was the distribution of Stock to unsecured claimants.  To support the argument that revocation would not require rescinding the Stock distributions that have been made, plaintiffs posit that "[t]o the extent that any Comair Creditors received full or partial distribution on their claims in the form of New Delta Common Stock, such claims (or a portion thereof) shall be deemed to have been sold to Delta in exchange for such New

Delta Common Stock, and the applicable Comair Creditor may vote only the remaining portion of its claims." Plaintiffs' Memorandum at 44. Plaintiffs add in a footnote that they "reserve their right to argue (i) for disallowance of any vote of such 'sold' claims by Delta as not having been made in good faith, (ii) that such vote should not be considered in determining whether at least one impaired class has accepted a resolicited plan, and (iii) that any distributions to Delta in respect of such 'sold' claims should be equitably subordinated." *Id.* If these suggestions were taken seriously, the Court would not be revoking the Plan (as required by the statute) but completely rewriting the Plan (without statutory authority) in a fashion not voted on, proposed by or even reviewed by the Comair creditors. Section 1144 does not contemplate such a modification. *See Almeroth v. Innovative Clinical Solutions, Ltd. (In re Innovative Clinical Solutions, Ltd.)*, 302 B.R. 136, 144 (Bankr. D. Del. 2003) ("[Modification of a plan] is obviously not a form of relief contemplated by § 1144.").

Plaintiffs also argue that because the Plan was structured so that it could have been implemented with respect to only the Delta debtors, none of the creditors can claim to be harmed by revocation of the Comair portion of the Plan because they could have had "no reasonable expectations that the Comair Debtors would be reorganized at the same time as the Delta Debtors or that Reorganized Delta Debtors would ultimately retain their ownership of the Comair Debtors." Plaintiffs' Memorandum at 45. This argument misses the fundamental point that the Plan was confirmed as a joint Plan and that the creditors have acted in reasonable reliance on the joint nature of the Plan in the year that has passed since the confirmation order was entered, regardless of what they may have reasonably expected prior to entry of the confirmation order.

### B.   Equitable mootness

The Constitutional doctrine of mootness is premised "on the fundamental jurisdictional tenet that Federal courts are empowered to hear only live cases and controversies." *Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*, 92 B.R. 38, 45 (S.D.N.Y. 1988). Thus, "if an event occurs while a case is pending on appeal that makes it impossible for the court to grant 'any effectual relief whatever'

to a prevailing party, the appeal must be dismissed." *Church of Scientology of California v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)).

Bankruptcy courts also possess the power, separate from constitutional mootness, to dismiss a case as equitably moot "when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir. 2005) (citation and quotations omitted).  It is a prudential doctrine used by courts to avoid disrupting a reorganization plan once it is implemented.[15]  *Metromedia*, 416 F.3d at 144.  In certain situations, it may be highly impractical for a court to undo a reorganization plan due to the complex nature of the transactions involved.

The primary consideration in determining mootness is whether the plan has been substantially consummated.  *See Metromedia*, 416 F.3d at 144.  *See also In re Continental Airlines*, 91 F.3d 553, 560 (3d Cir. 1996) (noting that the "foremost consideration" in determining whether the equitable mootness doctrine applies is "whether the reorganization plan has been substantially consummated.").  "Substantial consummation" occurs upon:

> (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

11 U.S.C. § 1101(2).  The many transactions (described above) that have taken place since the Plan's April 30, 2007 Effective Date demonstrate that the Plan has been "substantially consummated" pursuant to Section 1104(2).  As Judge Koeltl noted in *Kenton County Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)*, 374 B.R. 516, 523 (S.D.N.Y. 2007), "[t]he Joint Plan of Reorganization has now been confirmed and appears to be 'substantially consummated.'"

---

[15]    Although equitable mootness is often applied on appeal, it applies to proceedings under Section 1144.  *See Chang v. Servico, Inc. (In re Servico, Inc.),* 161 B.R. 297, 300-01 (S.D. Fla. 1993); *Almeroth v. Innovative Clinical Solutions, Ltd. (In re Innovative Clinical Solutions, Ltd.)*, 302 B.R. 136, 141 (Bankr. D. Del. 2003) (applying equitable mootness to dismiss a case brought under Section 1144); *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.)*, 171 B.R. 666, 669-70  (Bankr. D. Ariz. 1994) (dismissing Section 1144 complaint on grounds of mootness).

Upon a finding of substantial consummation, the court should dismiss an appeal from a

confirmation order as equitably moot unless it finds that:[16]

> (a) the court can still order some effective relief . . . (b) such relief will not affect "the re-
> emergence of the debtor as a revitalized corporate entity" . . . (c) such relief will not un-
> ravel intricate transactions so as to "knock the props out from under the authorization for
> every transaction that has taken place" and "create an unmanageable, uncontrollable situ-
> ation for the Bankruptcy Court" . . . (d) the "parties who would be adversely affected by
> the modification have notice of the appeal and an opportunity to participate in the pro-
> ceedings," . . . and (e) the appellant "pursue[d] with diligence all available remedies to
> obtain a stay of execution of the objectionable order . . . if the failure to do so creates a
> situation rendering it inequitable to reverse the orders appealed from. . . ."

*Frito-Lay Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 952-53 (2d Cir. 1993) (cita-

tions omitted).  *See also In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994) ("In common with

other courts of appeals, we have recognized that a plan of reorganization, once implemented, should be

disturbed only for compelling reasons.").

Here, any attempt to revoke the Plan would "'knock the props out from under the autho-

rization for every transaction that has taken place' and 'create an unmanageable, uncontrollable situa-

tion'" for this Court because of the nature and complexity of the multitude of transactions that have taken

place since confirmation, such as the issuance and trading of New Delta Common Stock, the advancement

of the senior secured exit financing facility, the negotiation of various aircraft restructuring agreements

and the effectuation of claims resolutions — both negotiated and litigated.  It would be impossible to

undo these transactions.

In addition, the plaintiffs have not acted in accordance with the spirit of the Bankruptcy

Code in seeking Section 1144 revocation in the manner they did.  Courts have denied relief on grounds of

mootness when the plaintiffs have not sought a stay of the confirmation order.[17]  *See New York City Dep't*

*of Finance v. 1515 Broadway Assocs. (In re 1515 Broadway Assocs.)*, 153 B.R. 400, 404 (S.D.N.Y. 1993)

(stating that in the absence of a stay an appeal of a confirmation order may be dismissed as moot because,

---

[16]    Though this rule is usually applied in the context of an appeal of a confirmation order, it applies with equal
force to an action brought under Section 1144.  *See* footnote 15, *supra*.

[17]    The stay is often required on appeal, but the policy considerations apply with equal force to cases brought
in the Bankruptcy Court under Section 1144.

in part, "the mootness doctrine promotes an important policy of bankruptcy law:  that court-approved

reorganizations go forward in reliance upon such approval unless a stay has been obtained").  *See also*

*Deutsche Bank*, 416 F.3d 136, 144 (2d Cir. 2005) (insisting that parties seek a stay and holding that where

they do not, the appeal of a confirmation order may be dismissed as moot if that failure renders relief

inequitable).  Here, the plaintiffs did not seek a stay and waited until the 180th day after confirmation to

bring the claim.  Though this failure does not automatically make the plaintiffs' claims moot, it renders

the plaintiffs' desired relief inequitable because of the many transactions that have taken place in reliance

on the Plan since the plaintiffs learned of the alleged fraud more than ten months ago.

<u>**Conclusion**</u>

The belated attempt by five speculators, which purchased $125 million of claims after the

deadline to vote on the Plan or even confirmation of the debtors' joint Plan, to revoke the Plan, which was

nearly unanimously approved by tens of thousands of creditors holding nearly $14 billion of claims none

of whom has sought revocation, must be examined carefully and with skepticism.  Putting aside these

plaintiffs' apparent lack of standing to assert the type of fraud required by Section 1144, the failure of the

amended complaint to allege facts constituting fraud as of February 2, 2007 and plaintiffs' reliance

instead on an impractical "duty to update" an estimate based on subsequent events, Plan revocation can-

not be granted here because the statutory requirement that a revocation order "contain such provisions as

are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation"

cannot possibly be met in this case.

Counsel for defendants will prepare an appropriate order, approved as to form by plain-

tiffs' counsel, without prejudice to plaintiffs' right to appeal.

Dated:   White Plains, New York
April 30, 2008

<u>/s/ Adlai S. Hardin, Jr.</u>
U.S.B.J.